J. S57015/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA, : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
v. : No. 1581 WDA 2015
:
AMY MARKET :

Appeal from the Order Entered September 10, 2015,
in the Court of Common Pleas of Lawrence County
Criminal Division at No. CP-37-CR-0000651-2014

BEFORE: FORD ELLIOTT, P.J.E., SHOGAN AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED AUGUST 10, 2016**

The Commonwealth appeals from the order of September 10, 2015, granting the defendant/appellee, Amy Market's petition for writ of ***habeas corpus*** and dismissing the charges. After careful review, we reverse.

The victim, "E.M.," was a six-month-old male infant at the time of the alleged incident. He lived with his parents, Edward and Tana, and defendant/appellee, his paternal aunt. Appellee was a primary caregiver of E.M. On October 13, 2013, E.M. became lethargic and his face was twitching, similar to a seizure. Tana took E.M. to Ellwood City Hospital, and he was transported by helicopter from there to Children's Hospital in Pittsburgh. E.M. was evaluated on October 14, 2013, by Jennifer E. Wolford, D.O., a pediatrician. An MRI revealed multiple chronic subdural hematomas on both sides of the head. Dr. Wolford's assessment was that E.M. was the

_____

* Retired Senior Judge assigned to the Superior Court.

victim of child physical abuse. As a result of a police investigation, during which appellee admitted to having become frustrated and shaking E.M. approximately one week prior to his admission to the hospital, appellee was arrested and charged with one count each of aggravated assault, endangering the welfare of children ("EWOC"), simple assault, and recklessly endangering another person ("REAP").[1]

A preliminary hearing was held on March 13, 2014, before Magisterial District Judge Jennifer L. Nicholson. Dr. Wolford testified via telephone. Lieutenant David Kingston of the Ellwood City Police Department also testified. Following the hearing, Judge Nicholson ruled that there was insufficient evidence to connect E.M.'s injuries to appellee's actions, and dismissed the charges.

The Commonwealth re-filed the charges, and the matter was waived to court; however, appellee subsequently filed a petition for a writ of ***habeas corpus***. A hearing was held on the petition on April 28, 2015, before the Honorable J. Craig Cox. The March 13, 2014 preliminary hearing transcript was admitted into evidence, as well as recordings of appellee's interviews with police and Dr. Wolford's medical report. The criminal complaint and affidavit of probable cause were of record. (Notes of testimony, 4/28/15 at 5-6.)

---

[1] 18 Pa.C.S.A. §§ 2702(a)(1), 4304(a)(1), 2701(a)(1), and 2705, respectively.

On September 10, 2015, the trial court granted appellee's **habeas** petition and dismissed the charges. The trial court determined that the Commonwealth failed to establish what caused E.M.'s injuries. A timely notice of appeal was filed on September 24, 2015.[2] On October 1, 2015, the Commonwealth was ordered to file a concise statement of errors complained of on appeal within 21 days pursuant to Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A.; the Commonwealth timely complied on October 14, 2015, and on January 4, 2016, the trial court filed a Rule 1925(a) opinion.

The Commonwealth has raised the following issues for this court's review:

> I. Whether the trial court erred in disregarding the entirety of the medical testimony and medical reports in determining that the testifying medical doctor failed to establish the cause of injury to the infant child as non-accidental?
>
> II. Whether the trial court applied an incorrect standard in reviewing the medical testimony of the treating child abuse physician where the Commonwealth's burden was only to establish a **prima facie** case?
>
> III. Whether the stipulated exhibits presented as evidence at the hearing on **habeas corpus**, consisting of an affidavit of probable cause, recorded interviews with the defendant, medical reports, and preliminary hearing testimony, establish **prima facie** evidence of the charges filed against defendant?

---

[2] The trial court's order is appealable because it terminates the prosecution. Pa.R.A.P. 311(d); **Commonwealth v. Karetny**, 880 A.2d 505, 512-513 (Pa. 2005).

Commonwealth's brief at 7 (emphasis supplied; capitalization omitted).

> We review a decision to grant a pre-trial petition for a writ of **habeas corpus** by examining the evidence and reasonable inferences derived therefrom in a light most favorable to the Commonwealth. **Commonwealth v. James**, 863 A.2d 1179, 1182 (Pa.Super. 2004) (**en banc**). In **Commonwealth v. Karetny**, 583 Pa. 514, 880 A.2d 505 (2005), our Supreme Court found that this Court erred in applying an abuse of discretion standard in considering a pre-trial **habeas** matter to determine whether the Commonwealth had provided **prima facie** evidence. The **Karetny** Court opined, "the Commonwealth's **prima facie** case for a charged crime is a question of law as to which an appellate court's review is plenary." **Id.** at 513, 880 A.2d 505; **see also Commonwealth v. Huggins**, 575 Pa. 395, 836 A.2d 862, 865 (2003) ("The question of the evidentiary sufficiency of the Commonwealth's **prima facie** case is one of law[.]"). The High Court in **Karetny** continued, "[i]ndeed, the trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its pre-trial, **prima facie** burden to make out the elements of a charged crime." **Karetny**, **supra** at 513, 880 A.2d 505. Hence, we are not bound by the legal determinations of the trial court. To the extent prior cases from this Court have set forth that we evaluate the decision to grant a pre-trial **habeas corpus** motion under an abuse of discretion standard, our Supreme Court has rejected that view. **See id.**

**Commonwealth v. Dantzler**, 135 A.3d 1109, 1111-1112 (Pa.Super. 2016)

(**en banc**) (footnote omitted).

> At the preliminary hearing stage of a criminal prosecution, the Commonwealth need not prove the defendant's guilt beyond a reasonable doubt, but rather, must merely put forth sufficient evidence to

> establish a ***prima facie*** case of guilt. A ***prima facie*** case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes probable cause to warrant the belief that the accused committed the offense. Furthermore, the evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to be decided by the jury.

***Karetny***, 880 A.2d at 513-514 (citations omitted).

It is unnecessary in this case to set forth all of the elements of each crime charged. The trial court based its decision on the conclusion that the Commonwealth failed to show that appellee's allegedly reckless behavior was the cause of E.M.'s injuries. (Trial court opinion, 1/4/16 at 13.) According to the trial court, the Commonwealth failed to tie any of appellee's alleged actions to the harm suffered by E.M. (***Id.*** at 13-14.) We disagree.

Dr. Wolford testified that she evaluated E.M. on October 14, 2013. (Notes of testimony, 3/13/14 at 8.) E.M. presented with a history of seizures and labored breathing. (***Id.*** at 10.) A CT scan of E.M.'s head revealed a large subdural hematoma on the left side and extra fluid on the right side. (***Id.*** at 9.) A subdural hematoma is associated with abusive head trauma, commonly known as "shaken baby syndrome." (***Id.*** at 11-12.) Dr. Wolford testified that E.M.'s injuries were consistent with non-accidental trauma. (***Id.*** at 11.) Dr. Wolford testified that E.M.'s injuries were 3-10 days old. (***Id.*** at 13-14.)

Dr. Wolford described the etiology of abusive head trauma as follows:

> Abusive head trauma typically is a shaking and a shearing effect, so the child is shaken out of frustration; the head rotates back and forth quickly in a forward/backward movement. This is what causes the bleeding because the small vessels that are sensitive underneath the dura on top of the brain tear and bleed and so it may or may not include an impact. Sometimes there's a slam down on a table or on a bed or on a wall with frustration but not always, so it's a shaking effect, plus or minus an impact.

*Id.* at 14.

Dr. Wolford testified that abusive head trauma can be life-threatening and can result in permanent injuries. (***Id.*** at 20.) E.M. also had Type I von Willebrand's disease which is a coagulation defect. (***Id.*** at 17.) An individual with von Willebrand's disease does not clot blood as easily and is prone to re-bleeding following an injury. (***Id.***) However, on cross-examination, Dr. Wolford disagreed that E.M.'s blood disorder was related to his injuries:

> So when we know that children have spontaneous bleeds due to a bleeding disorder or such as glutaric acidemia, which is a metabolic disorder, when they have blood found on the top of their head, they don't have symptoms. That's the big issue is they don't have symptoms. [E.M.] had symptoms, so that blood was irritating his head. When there's just a spontaneous bleed, you don't have symptoms because there's been no trauma to it. There's been no probably diffuse axonal injury. So the truth is my evaluation of a subdural hematoma with the presentation of seizures informed my medical assessment to a reasonable degree of medical certainty that the far most likely explanation of this is abusive head trauma.

*Id.* at 30.

Dr. Wolford disagreed that less violent shaking could cause abusive head trauma in a baby with von Willebrand's disease:

> Normal care -- von Willebrand's disease is the most common blood disorder in the world. Two to three percent of people have von Willebrand's disorder and don't even know it because they don't have issues. So if you think of all the babies out there in Lawrence County, Beaver County and Allegheny County alone, all the counties between us, normal care by reasonable adult caretakers does not cause brain injury in children.

*Id.* at 31-32. Dr. Wolford reiterated that the most likely diagnosis was abusive head trauma: "Glutaric acidemia, and then there's [sic] other types of bleeding disorders, not von Willebrand's, that can cause spontaneous blood disorder or bleeding, but the most likely diagnosis, especially given [E.M.]'s presentation of a seizure, is abusive head trauma." (*Id.* at 29.)

Lieutenant Kingston testified that the primary caretakers of E.M. were appellee and the child's mother. (*Id.* at 50.) The child's father worked long hours and was not considered a primary caregiver. (*Id.*) Appellee lived with E.M. and his parents. (*Id.* at 52.) When E.M.'s mother had to leave the house, appellee would look after E.M. (*Id.*) At first, no one admitted to any type of abusive behavior towards E.M. (*Id.* at 51.) During subsequent interviews, however, appellee admitted to becoming frustrated and shaking E.M. from side to side:

> She confirmed that at one point in time, she had become frustrated with the child, had

> grabbed her (sic) aggressively from the crib and shook the infant.
>
> Q[.] Okay. What date was that when she mentioned it?
>
> A[.] She felt it was one week prior to when the child went into the hospital. The previous Sunday, I believe it was.
>
> Q[.] Okay.
>
> A[.] And that she knew that it had done something because it caused fright in the infant.
>
> Q[.] Okay.
>
> A[.] And that the eyes got big and the baby quit crying.

*Id.* at 52-53. "[Appellee] again admitted that she shook the baby out of frustration and the baby's head went side to side for several seconds. [Appellee] stated that she knows her actions at least caused fright in the infant because his eyes got very big and he stopped crying." (*Id.* at 55.)

In the affidavit of probable cause, it stated that on November 11, 2013, appellee admitted that she was frustrated by the baby's crying and that she took anxiety pills. Appellee also admitted that she called her mother after the incident because she was afraid she had hurt the baby:

> [Appellee] stated there was one occasion she had aggressively grabbed the infant from the crib and shook the infant. [Appellee] stated she had done this one-week prior to the baby being taken to the hospital and the discovery of the brain/head injury. [Appellee] demonstrated how she shook the baby for police and made the statement that she didn't think she hurt him. During the interview [appellee] gave

the statement that she had to take two anxiety pills before she handled the baby. The baby was crying and was gassy when she aggressively picked up the baby and moved him from side to side. The baby's eyes became very big at this time. *** After the baby was asleep she called her mother and asked her if she though [sic] she hurt the baby and told the mother what she had did [sic]. After talking to the mother she felt she did not hurt the baby at this time.

Affidavit of probable cause, 6/17/14 at 2; RR at 13. Appellee acknowledged a history of mental health problems and that she had to take anxiety pills that day to deal with the baby. (*Id.*) In addition, officers conducting the interviews felt that appellee was minimizing her aggressive actions towards E.M.:

However, it is apparent during her interview with this officer, that [appellee] attempted to minimize the force she used when she shook the child. [Appellee] also indicated that the incident may have occurred a couple weeks prior to the child having seizures. [Appellee] also confirmed that she called her mother after the shaking incident, to ask her mother if that (shaking from side to side) could harm the child, and [appellee] indicated her mother told her she didn't know. [Appellee] confirmed that she called her mother, because the child abruptly stopped crying after she shook him. [Appellee] also indicated that she had taken an additional anxiety pill that morning to deal with her frustration with the child crying.

*Id.*

The trial court determined that the Commonwealth failed to establish that appellee's conduct caused the injuries to E.M. (Trial court opinion, 1/4/16 at 16.) In addition, the trial court found that there was no medical

testimony to link E.M.'s injuries to any dangers presented by appellee's conduct. (*Id.* at 14.) The trial court found that Dr. Wolford's testimony was vague and general in nature, and failed to establish to a reasonable degree of medical certainty that the alleged actions of appellee caused the injuries in question to E.M. (*Id.* at 18.) The trial court stated that, "At no point did Dr. Wolford establish that if Defendant [] performed the actions she admitted to, a subdural hematoma would result." (*Id.* at 17.)

We reiterate that, "At the preliminary hearing stage of a criminal prosecution, the Commonwealth need not prove the defendant's guilt beyond a reasonable doubt, but rather, must merely put forth sufficient evidence to establish a *prima facie* case of guilt." *Karetny*, 880 A.2d at 513-514 (citations omitted). "[A] *prima facie* case is a low threshold of proof. . . ." *Dantzler*, 135 A.3d at 1114. Here, appellee's inculpatory statements to police, together with Dr. Wolford's expert testimony, were enough to make out a *prima facie* case. Dr. Wolford testified that E.M.'s injuries were most likely the result of abusive head trauma, which is caused by violent shaking. This was based on the presence of the large subdural hematoma, as well as the history of seizures. Furthermore, Dr. Wolford was able to rule out von Willenbrand's disease as a causative factor. Dr. Wolford testified that the age of the injuries was 3-10 days, which dovetailed with appellee's admission to police that approximately one week prior to E.M.'s

admission to the hospital, she had shaken him from side to side in an aggressive manner.

Appellee admitted that she was so perturbed by the baby's crying that she had to take anti-anxiety medication. She did not shake E.M. in a playful manner, but admitted that she was frustrated and upset. Appellee was concerned enough by E.M.'s reaction that she telephoned her mother. At trial, a jury would be free to disbelieve appellee's self-serving explanations that she simply "moved him from side to side" and that she did not think she hurt the baby. *See Commonwealth v. Smith*, 956 A.2d 1029, 1037 (Pa.Super. 2008) (*en banc*) ("nothing more than common sense is needed to know that the violent shaking of an infant child provides for a substantial and unjustifiable risk of serious bodily injury"). Indeed, the investigating officers felt that she was purposefully minimizing the degree of force she used when she demonstrated her actions for the officers. Taken altogether, this evidence established probable cause to warrant the belief that the accused, appellee, committed the offenses charged.

The trial court opined that investigating officers pressured appellee to admit that she hurt E.M. (Trial court opinion, 1/4/16 at 14.) However, that is a suppression issue. At the preliminary hearing stage, all the evidence presented, together with all reasonable inferences, must be examined in a light most favorable to the Commonwealth to determine whether it met its burden of proving a *prima facie* case. *Dantzler*, 135 A.3d at 1112.

For the reasons discussed above, we find that, as a matter of law, the Commonwealth satisfied its burden. There was enough evidence for a jury to reasonably infer that appellee's conduct caused E.M.'s injuries. Therefore, the trial court erred in granting appellee's petition for writ of **habeas corpus** and dismissing the charges.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/10/2016