J-A28009-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD SCOTT CARVER | : | No. 377 MDA 2018 |

Appeal from the Order Entered January 30, 2018
In the Court of Common Pleas of Schuylkill County Criminal Division at
No(s): CP-54-CR-0001646-2017

BEFORE: LAZARUS, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.: **FILED FEBRUARY 04, 2019**

The Commonwealth filed this interlocutory appeal from the order, entered in the Court of Common Pleas of Schuylkill County, granting Richard Scott Carver's writ of habeas corpus, dismissing the charges against him, and directing his release from prison. After our review, we affirm in part, and reverse in part.

We adopt the trial court's recitation of the procedural and factual history:

On August 13, 2017, charges were filed against the Defendant based on an incident that allegedly occurred on Saturday, August 12, 2017. The charges included Lur[ing] Child into Motor Vehicle, Criminal Attempt, pursuant to 18 Pa.C.S. § 2910(a)(2), Interference with Custody of Children, Criminal Attempt, pursuant to 18 Pa. C.S. § 2904(a), and Indecent Exposure pursuant to 18 Pa.C.S. § 3127(a). The Defendant was arrested and placed in jail, unable to post bail. At the preliminary hearing, the charges were bound over for Court. The Defendant was then able to post bail on September 18, 2017. However, his bail was revoked on

October 27, 2017, because the Defendant provided the address of a condemned building as his permanent residence, and because the Defendant was seen at the child's bus stop attempting to make contact with the child.

On October 26, 2017, counsel for the Defendant filed a Petition for Writ of Habeas Corpus, alleging that the Commonwealth's evidence was insufficient as a matter of law to establish a *prima facie* case to support each of the charges. We held a hearing on the Petition on November 21, 2017. [T]he preliminary hearing was not stenographically recorded[;] the parties presented evidence as follows. The alleged victim, Z.K. ("child"), age 12, testified first. We conducted a colloquy and determined that the child was competent to testify. The child testified that on August 12, 2017, he was involved in an incident with the Defendant, whom he identified in Court. It was the day of the annual block party in Girardville, Pennsylvania, and the child was riding his bicycle along the sidewalk with his friend, M.C. M.C. was about a half block ahead of the child, and the child was walking his bike up a hill, when the Defendant pulled up alongside the child in a gold/tan motor vehicle, after having made a U-turn from the other direction. The child testified that he did not know the Defendant personally before this day. The Defendant rolled down the driver's side window of his car, less than halfway, and said "Sup, nigga" to the child. The child was surprised and said "hi" to the Defendant. The Defendant asked the child if he was excited for school, and the child replied, "Not really." The Defendant then rolled his car window down completely, moved his hand slightly out of the window, and said "high five" to the child. The hand was extended with the palm facing upward, in an underhand fashion like a "low five," with his elbow bent. The child shook his head negatively. The Defendant then said, "Come on," and a few seconds later asked the child to "take my hand," to which the child said "no." At this point, the Defendant had extended his hand farther out of the car window. The child turned his bike around. The Defendant then asked the child, "How many years have you known me?" The child replied, "Zero," and got on his bike and rode off to tell his friend M.C. what happened. The Defendant did not follow the child in his car. The child testified that the car turned right and then looked like it then stopped at a house, about a block away from their encounter, in the opposite direction from the direction the child was heading.

The child testified that the Defendant did not tell him or ask him to get in the car, nor did the Defendant try to grab him. The child

testified that during the encounter, the child and Defendant remained approximately 8 feet apart. The child testified that he became very upset by the encounter. He and M.C. went to the block party and told his grandmother about it, and then his grandmother told Joe Catizone ("Mayor"), the Mayor of Girardville. The Mayor then contacted the police, and Patrolman Jody Long ("Officer Long") of the Girardville Police interviewed the child. After the interview, Officer Long, the child, the child's mother (who by then had arrived at the block party) and the Mayor then drove around Girardville in Officer Long's police car looking for the Defendant. The child testified that they were able to locate the Defendant in a trailer on Ogden Street, where the Defendant's car was parked, and that the child was able to identify the Defendant after hearing his voice. Next, M.C., age 16, testified. We conducted a colloquy and determined that he was competent to testify. M.C. was 15 years old at the time of the incident. M.C. does not know the Defendant. However, M.C. had seen the Defendant "around town" prior to August 12, 2017, riding a mini bike, which M.C. admired. That day, M.C. observed the Defendant and the child having a conversation along North Williams Street in Girardville. M.C. observed a gold Buick pull up alongside the child and a voice say, "Come on, give me your hand" or "take my hand" to the child. M.C. heard the child say "no." M.C. did not hear any other part of the conversation. M.C. testified that he knew it was the Defendant because M.C. had seen the Defendant's face when the car pulled up, but M.C. kept going. M.C. said that he next saw the child at the block party because they had gone different ways after the incident. He said the child was upset.

Next, Mayor Catizone testified. He first met the Defendant a few years ago, but did not know his name. The Mayor was at the block party when the child came up to him and told him that a stranger had approached the child and tried to talk with him, and the child felt he was potentially in danger. The Mayor called the police. The child appeared shaken. The Mayor and the child went with Officer Long in the patrol car to look for the Defendant. The child was able to describe the color of the car and also believed it was a Buick. They found the vehicle and Officer Long located the Defendant and brought him over to the car. The child was able to identify the Defendant's voice. The Mayor walked back to the block party and later went to the police station to give his statement to the police.

At the police station, the Defendant was yelling that he was having a heart attack and acting extremely agitated. EMTs arrived, checked the Defendant and concluded that he was not having a

heart attack. After the Defendant was cleared by the EMTS, the Defendant remained combative and yelled insults at the Mayor and Officer Long.

Finally, Officer Long testified. He was dispatched to the block party to investigate a possible abduction. The child told Officer Long that a guy in a goldish[-]colored car tried grabbing him. The child described the man as having long dirty blond hair and sunglasses. Officer Long and the Mayor contacted the child's mother; and the five of them drove around town, looking for the suspect. Long also spoke with M.C., who knew that the man's first name was Richard. M.C. told Long that Richard lived on Ogden Street in a trailer. As they arrived at the Ogden Street location, the Defendant came out of the trailer and greeted Officer Long. Officer Long told the Defendant that he was investigating a possible child abduction, and asked the Defendant to submit to an identification. The child identified the Defendant as the man, and asked to hear his voice, so Officer Long brought the Defendant over to the car while the child, who was upset, remained in the back seat with the window slightly lowered. As Officer Long and the Defendant had a verbal discussion, the child got even more upset and said that was "absolutely" the man. Officer Long then arrested the Defendant, handcuffed him in the front, gave him his Miranda warnings and took him to the police station. The Defendant became very combative and uncooperative, and intentionally shoved his body into Officer Long as Officer Long was removing the Defendant from the police car. The Defendant was placed on a bench, still in handcuffs, and Officer Long sat at a desk across from the bench. As Long was typing up the charges, the Defendant continued to be combative and began breathing heavily and spitting on the floor, as if he were hyperventilating. Officer Long kept asking the Defendant to remain seated and to stop spitting in the floor. The Defendant then fell over onto the floor, and after being lifted upright by the officer, stated that he was having a heart attack, and accordingly Officer Long called EMS, and he was medically cleared. The Defendant was then shackled and taken to Mahanoy City to be placed in a holding cell because of his uncooperative conduct. Officer Long then recalled that sometime prior to the claimed heart attack, he had observed that the Defendant had pulled his cotton shorts aside, exposing his genitals. When Officer Long asked what he was doing, the Defendant stated, "I'm going to piss on your floor." Officer Long told the Defendant that he was not going to do that and expressed incredulity at the Defendant, who had not asked to use the

restroom. The Defendant then pulled his shorts back. The Defendant then went on to complain about his health and that he was having a heart attack.

At the conclusion of the evidence, the Court offered both parties the opportunity to file post-hearing briefs. Counsel for the Defendant filed a brief on December 5, 2017. In that brief, the Defendant argued that his conduct did not rise to a "luring" [or] attempt to commit interference with the custody of a child, that both charges must be dismissed. We agreed, dismissed the charges and the Commonwealth has appealed.

Trial Court Opinion, 5/10/18, at 1-7.

On appeal, the Commonwealth raises two issues:[1]

1. Whether the trial court erred by granting Carver's petition for writ of habeas corpus because the evidence, viewed in the light most favorable to the Commonwealth, established a *prima facie* case that Carver attempted to lure a child into his vehicle through enticing words and/or hand gestures and/or commanding the child to take his hand?

2. Whether the trial court erred by granting Carver's petition for writ of habeas corpus because the evidence, viewed in the light most favorable to the Commonwealth, established a *prima facie* case that Carver indecently exposed himself by exposing his genitals at a police station where a police officer was nearby?

Commonwealth's Brief, at 3.

We review a decision to grant a pre-trial petition for a writ of habeas corpus by examining the evidence and reasonable inferences derived

---

[1] In its Pa.R.A.P 1925(b) statement of errors complained of on appeal, the Commonwealth challenged the dismissal of the attempted interference with child custody charge. The Commonwealth has not brought that issue forward on appeal.

therefrom in a light most favorable to the Commonwealth. ***Commonwealth v. James***, 863 A.2d 1179, 1182 (Pa. Super. 2004) (en banc). In ***Commonwealth v. Karetny***, 880 A.2d 505 (Pa. 2005), our Supreme Court found that this Court erred in applying an abuse of discretion standard in considering a pre-trial habeas corpus matter to determine whether the Commonwealth had provided *prima facie* evidence. The Commonwealth's prima *facie* case for a charged crime is a question of law as to which an appellate court's review is plenary. ***Id.*** at 505. "[I]ndeed, the trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its pre-trial, *prima facie* burden to make out the elements of a charged crime." ***Id. See Commonwealth v. Dantzler***, 135 A.3d 1109, 1111–12 (Pa. Super. 2016).

To demonstrate a *prima facie* case exists, the Commonwealth must produce evidence of every material element of the charged offense(s) as well as the defendant's complicity therein. ***Commonwealth v. Fowlin***, 676 A.2d 665, 673 (Pa. Super. 1996). Proof beyond a reasonable doubt is not required at the habeas stage, but the Commonwealth's evidence must be such that, if accepted as true, it would justify a trial court in submitting the case to a jury. ***Id***. Additionally, in deciding a habeas petition, a court must view the evidence and its reasonable inferences in the light most favorable to the Commonwealth. ***Id***. Suspicion and conjecture, however, are unacceptable. ***Id.***

The offense of luring a child into a motor vehicle or structure provides as follows:

**§ 2910. Luring a child into a motor vehicle or structure**

A person who lures a child into a motor vehicle without the consent, express or implied, of the child's parent or guardian, unless the circumstances reasonably indicate that the child is in need of assistance, commits a misdemeanor of the first degree.

18 Pa.C.S.A. § 2910. A "lure," for purposes of the offense of attempted luring of a child into a motor vehicle, involves "the making of a promise of pleasure or gain, the furnishing of a temptation or enticement, or the performance of some other affirmative act calculated to strongly induce another individual to take a particular action[.]" ***Commonwealth v. Hart***, 28 A.3d 898, 909 (Pa. 2011).

After our review, we conclude that the trial court properly dismissed the charge of attempt to lure a child. We agree with the trial court that, even viewing the evidence in the light most favorable to the Commonwealth, there was no evidence of enticement or temptation to induce the child to enter the vehicle. We rely on the court's opinion to dispose of this claim. ***See*** Trial Court Opinion, ***supra*** at 9-11 (Carver did not offer any enticement to child, did not attempt to force child to touch his hand, did not get out of his car, child was 8 feet away during entire encounter; evidence does not rise to level needed to establish *prima facie* case).

With respect to the indecent exposure charge, however, we reverse the court's order. Section 3127 provides:

**§ 3127. Indecent exposure**

(a)    Offense defined.--A person commits indecent exposure if that person exposes his or her genitals in any public place or in any place where there are present other persons under circumstances in which he or she knows or should know that this conduct is likely to offend, affront or alarm.

18 Pa.C.S.A. § 3127(a).

Officer Long's testimony would enable a jury to conclude that Carver exposed his genitals at the police station only a few feet from Officer Long. Further, the trial court acknowledged that Officer Long "expressed incredulity at [Carver.]" Trial Court Opinion, at 6. A jury could reasonably infer from Officer Long's testimony that the station did not have a holding cell, and, thus, the area where Carver was being held was a public place. A jury could also reasonably infer that Carver knew his actions would "offend, affront or alarm." 18 Pa.C.S.A. § 3127(a). Viewing the evidence in the light most favorable to the Commonwealth, we conclude the Commonwealth presented sufficient evidence to establish a *prima facie* case of indecent exposure.

Order affirmed in part, reversed in part and remanded for further proceedings. Jurisdiction relinquished.

Judge Musmanno joins this Memorandum.

Judge Olson files a Concurring and Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 02/04/2019

COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : No. CP-54-CR-1646-2017
                            :
           vs.                 :
                            :
RICHARD SCOTT CARVER,        :
               Defendant     :

Christopher J. Schmidt, Deputy Attorney General – for the Commonwealth
Karen A. Domalakes, Esquire, Public Defender – for the Defendant

## OPINION OF COURT

**DOLBIN, J.**

This Opinion is written pursuant to Pa.R.A.P. 1925(b).

This appeal by the Commonwealth filed February 27, 2018 is taken from our

Order of January 30, 2018, granting Defendant Richard Scott Carver's ("Defendant's")

Writ of Habeas Corpus, dismissing the charges against him, and directing his release

from prison.

On August 13, 2017, charges were filed against the Defendant based on an

incident that allegedly occurred on Saturday, August 12, 2017. The charges included

Lure Child into Motor Vehicle, Criminal Attempt, pursuant to 18 Pa. C.S. § 2910(a)(2),

Interference with Custody of Children, Criminal Attempt, pursuant to 18 Pa. C.S. §

2904(a), and Indecent Exposure pursuant to 18 Pa. C.S. § 3127(a). The Defendant was

arrested and placed in jail, unable to post bail. At the preliminary hearing, the charges

were bound over for Court. The Defendant was then able to post bail on September 18,

2017. However, his bail was revoked on October 27, 2017, because the Defendant

provided the address of a condemned building as his permanent residence, and also because the Defendant was seen at the child's bus stop attempting to make contact with the child.[1]

On October 26, 2017, counsel for the Defendant filed a Petition for Writ of Habeas Corpus, alleging that the Commonwealth's evidence was insufficient as a matter of law to establish a *prima facie* case to support each of the charges.

We held a hearing on the Petition on November 21, 2017. Because the preliminary hearing was not stenographically recorded, the parties presented evidence as follows.

The alleged victim, Z.K. ("child"), age 12, testified first. We conducted a colloquy and determined that the child was competent to testify. The child testified that on August 12, 2017, he was involved in an incident with the Defendant, whom he identified in Court. It was the day of the annual block party in Girardville, Pennsylvania, and the child was riding his bicycle along the sidewalk with his friend, M.C. M.C. was about a half block ahead of the child, and the child was walking his bike up a hill, when the Defendant pulled up alongside the child in a gold/tan motor vehicle, after having made a u-turn from the other direction. The child testified that he did not know the Defendant personally before this day. The Defendant rolled down the driver's side window of his car, less than halfway, and said "Ssup, nigga" to the child. The child was surprised and said "hi" to the Defendant. The Defendant asked the child if he was excited for school, and the child replied, "not really." The Defendant then rolled his car

---

[1] No further charges were lodged against the Defendant for that incident.

window down completely and moved his hand slightly out of the window and said "high five" to the child. The hand was extended with the palm facing upward, in an underhand fashion like a "low five," with his elbow bent. The child shook his head negatively. The Defendant then said "come on," and a few seconds later asked the child to "take my hand," to which the child said "no." At this point the Defendant had extended his hand farther out of the car window. The child turned his bike around. The Defendant then asked the child, "How many years have you known me?" The child replied, "Zero," and got on his bike and rode off to tell his friend M.C. what happened.

The Defendant did not follow the child in his car. The child testified that the car turned right and then looked like it then stopped at a house, about a block away from their encounter, in the opposite direction from the direction the child was heading. The child testified that the Defendant did not tell him or ask him to get in the car, nor did the Defendant try to grab him. The child testified that during the encounter, the child and Defendant remained approximately 8 feet apart.

The child testified that he became very upset by the encounter. He and M.C went to the block party and told his grandmother about it, and then the child and his grandmother told Joe Catizone ("Mayor"), the Mayor of Girardville. The Mayor then contacted the police, and Patrolman Jody Long ("Officer Long") of the Girardville Police interviewed the child.

After the interview, Officer Long, the child, the child's mother (who by then had arrived at the block party) and the Mayor then drove around Girardville in Officer Long's police car looking for the Defendant. The child testified that they were able to locate the

3

Defendant in a trailer on Ogden Street, where the Defendant's car was parked, and that the child was able to identify the Defendant after hearing his voice.

Next, M.C., age 16, testified. We conducted a colloquy and determined that he was competent to testify. M.C. was 15 years old at the time of the incident. M.C. does not know the Defendant. However, M.C. had seen the Defendant "around town" prior to August 12, 2017, riding a mini bike, which M.C. admired. That day, M.C. observed the Defendant and the child having a conversation along North Williams Street in Girardville. M.C. observed a gold Buick pull up alongside the child and a voice say, "Come on, give me your hand" or "take my hand" to the child. M.C. heard the child say "no." M.C. did not hear any other part of the conversation. M.C. testified that he knew it was the Defendant because M.C. had seen the Defendant's face when the car pulled up, but M.C. kept going. M.C. said that he next saw the child at the block party because they had gone different ways after the incident. He said the child was upset.

Next, Mayor Catizone testified. He first met the Defendant a few years ago, but did not know his name. The Mayor was at the block party when the child came up to him and told him that a stranger had approached the child and tried to talk with him, and the child felt he was potentially in danger. The Mayor called the police. The child appeared shaken. The Mayor and the child went with Officer Long in the patrol car to look for the Defendant. The child was able to describe the color of the car and also believed it was a Buick. They found the vehicle and Officer Long located the Defendant and brought him over to the car. The child was able to identify the Defendant's voice.

4

The Mayor walked back to the block party and later went to the police station to give his statement to the police. At the police station, the Defendant was yelling that he was having a heart attack and acting extremely agitated. EMTs arrived, checked the Defendant concluded that he was not having a heart attack. After the Defendant was cleared by the EMTS, the Defendant remained combative and yelled insults at the Mayor and Officer Long.

Finally, Officer Long testified. He was dispatched to the block party to investigate a possible abduction. The child told Officer Long that a guy in a goldish colored car tried grabbing him. The child described the man as having long dirty blond hair and sunglasses. Officer Long and the Mayor contacted the child's mother, and the five of them drove around town, looking for the suspect. Long also spoke with M.C., who knew that the man's first name was Richard. M.C. told Long that Richard lived on Ogden Street in a trailer.

As they arrived at the Ogden Street location, the Defendant came out of the trailer and greeted Officer Long. Officer Long told the Defendant that he was investigating a possible child abduction, and asked the Defendant to submit to an identification. The child identified the Defendant as the man, and asked to hear his voice, so Officer Long brought the Defendant over to the car while the child, who was upset, remained in the back seat with the window slightly lowered. As Officer Long and the Defendant had a verbal discussion, the child got even more upset and said that was "absolutely" the man.

Officer Long then arrested the Defendant, handcuffed him in the front, gave him his Miranda warnings and took him to the police station. The Defendant became very

5

combative and uncooperative, and intentionally shoved his body into Officer Long as Officer Long was removing the Defendant from the police car. The Defendant was placed on a bench, still in handcuffs, and Officer Long sat at a desk across from the bench. As Long was typing up the charges, the Defendant continued to be combative and began breathing heavily and spitting on the floor, as if he were hyperventilating. Officer Long kept asking the Defendant to remain seated and to stop spitting in the floor. The Defendant then fell over onto the floor, and after being lifted upright by the officer, stated that he was having a heart attack, and accordingly Officer Long called EMS, and he was medically cleared. The Defendant was then shackled and taken to Mahanoy City to be placed in a holding cell because of his uncooperative conduct.

Officer Long then recalled that sometime prior to the claimed heart attack, he had observed that the Defendant had pulled his cotton shorts aside, exposing his genitals. When Officer Long asked what he was doing, the Defendant stated "I'm going to piss on your floor." Officer Long told the Defendant that he was not going to do that and expressed incredulity at the Defendant, who had not asked to use the restroom. The Defendant then pulled his shorts back. The Defendant then went on to complain about his health and that he was having a heart attack.

At the conclusion of the evidence, the Court offered both parties the opportunity to file post-hearing briefs. Counsel for the Defendant filed a brief on December 15, 2017. In that brief, the Defendant argued that his conduct did not rise to a "luring" and that since the same alleged conduct was used to support both the luring charge and the

6

attempt to commit interference with the custody of a child, that both charges must be dismissed.

We agreed, dismissed the charges and the Commonwealth has appealed. The Commonwealth[2] raises the following issues on appeal:

1) Whether this Court abused its discretion by granting the Defendant's Petition for Writ of Habeas Corpus and dismissing the charges against him because the Commonwealth presented a *prima facie* case that the Defendant attempted to lure the child into his vehicle through enticing words and/or hand gestures and or commanding the child to take his hand.

2) Whether this Court abused its discretion in that the same evidence established a *prima facie* case that the Defendant attempted to interfere with the custody of a child.

3) Whether this Court abused its discretion in dismissing the charge of indecent exposure lodged against the Defendant.

Commonwealth's Concise Statement of Errors Complained of on Appeal.

In his motion, the Defendant contended that the Commonwealth was unable to sustain its burden of showing prima facie evidence that he was properly charged with the crimes. A petition for writ of habeas corpus is a proper way to test the sufficiency of the Commonwealth's evidence pre-trial. Commonwealth v. Hock, 556 Pa. 409, 414 n.2, 728 A.2d 943, 945 n.2 (1999). "In evaluating an accused's entitlement to pre-trial relief, a trial court must determine whether there is sufficient evidence to make out a *prima facie* case that the defendant committed the crime with which he or she is charged." Id., 556 Pa. at 414-15, 728 A.2d at 945.

---

[2] The Pennsylvania Attorney General entered his appearance in the case due to a conflict of interest arising from the recent election of Attorney Michael O'Pake as the Schuylkill County District Attorney.

7

At this stage of the proceedings, the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the crime. "As a result of the Commonwealth's bearing the minor burden of establishing a prima facie case, a witness's credibility is not an issue at a preliminary hearing. Neither is it for the court ruling on the motion for writ of habeas corpus to assess the credibility of the witnesses presented at the preliminary hearing." Commonwealth v. Lyons, 13 Pa. D.&C.5th 33, 40-41 (Lawrence Cty. 2010)(citing Commonwealth v. Carmody, 799 A.2d 143 (Pa. Super. 2002)). The evidence is to be viewed in the light most favorable to the Commonwealth, and we must consider all reasonable inferences based on that evidence which could support a guilty verdict. Commonwealth v. James, 863 A.2d 1179, 1182 (Pa. Super. 2004)(en banc).

We first address whether the evidence established a *prima facie* case of luring a child. Title 18, Pa. C.S. § 2910(a) provides:

> **(a) Offense.**—Unless the circumstances reasonably indicate that the child is in need of assistance, a person who lures or attempts to lure a child into a motor vehicle or structure without the consent, express or implied, of the child's parent or guardian commits an offense.

18 Pa. C.S. 2910(a). If the offense involves a child less than 13 years of age, it is a felony. 18 Pa. C.S. § 2910(a.1)(2).

The Pennsylvania Legislature has not provided us with a definition of "luring." Therefore, it has been left to the Courts to define.

In Commonwealth v. Hart, 611 Pa. 531, 28 A.3d 898 (2011), the Pennsylvania Supreme Court had the occasion to define the word "lure" in light of past case law, the

8

dictionary and the Statutory Construction Act, 1 Pa. C.S. §§ 1922, 1928. With the admonition that "where doubt exists concerning the proper scope of a penal statute, it is the accused who would receive the benefit of such doubt," the Court held that the mere invitation to give a child a ride, without any further enticement, was not a "lure." Hart, 611 Pa. at 548, 550, 28 A.3d at 908, 909-10. Specifically:

> Consistent with the plain and unambiguous meaning of the term "lure," we therefore hold that an attempt to lure under Section 2910 does not occur upon the mere offer of a ride in a motor vehicle to a child, but, rather, involves only situations where a child is provided a further enticement or inducement to enter the vehicle, in addition to the offer of the ride, particularly under such circumstances which suggest the child is being led into a potentially harmful situation. As the Superior Court recognized in [Commonwealth v. Adamo, 431 Pa. Super. 529, 637 A.2d 302(1994)], this enticement or inducement may be the promise of a pleasurable reward for entry into the vehicle such as receiving money or a treat such as candy or ice cream. Likewise, a similar attractive temptation could be created with the promise of the opportunity for the child to view an object of interest like a toy, a game, or a puppy. The enticement or inducement is evidence from the circumstances accompanying the making of the offer.

> Conversely, as the Superior Court has recognized, an enticement or inducement may take the form of a directive or a command to a child to enter a car, which suggests deleterious consequences to the child if he or she does not obey.

Id. at 550-51, 28 A.3d at 910.

The evidence in this case did not even rise to the level of an offer of a ride. Here there is no evidence that the Defendant offered the child a ride, nor is there any evidence that the Defendant ordered or directed the child to get into his car. Rather, the Defendant talked to the child and asked the child to touch his hand. Based on this evidence, the Commonwealth chose to charge the Defendant with trying to lure the child into his car.

9

There is also no evidence that the Defendant offered any enticement to the child. Rather, the evidence shows that the Defendant engaged the child in a conversation and tried to get the child to touch his hand. The Defendant did not attempt to force the child to touch his hand; the Defendant did not get out of his car, the child was approximately 8 feet away when the request was made, and when the child said no and left, the Defendant likewise left. Based on the child's testimony that the Defendant asked the child how long the child had known the Defendant, it is possible that the Defendant stopped and engaged the child because the Defendant thought he was someone else. This evidence simply does not rise to the level of evidence necessary to establish a *prima facie* case of attempt to lure a child into a motor vehicle.

We have considered the case of Commonwealth v. McClintock, 433 Pa. Super. 83, 639 A.2d 1222 (1994), in which the defendant was convicted for attempting to lure three children into his car (one time successfully) by waiving or motioning three or four times for each child to "come here." The Defendant would drive around the area of an elementary school slowly, and then pull over near a child and motion for them to come closer. Two children ran away; the third approached the car, upon which the Defendant asked the boy for directions to a local store. The defendant then insisted that the boy get into the defendant's car and show him where the store was located, which the boy did. Fortunately, a nearby grandmother recognized the defendant's car as a suspicious vehicle which she had seen repeatedly over the prior two weeks driving around the streets surrounding the local elementary school. The grandmother blew her own car horn relentlessly until the defendant reached over and opened his passenger door so that the

10

child could get out. The Pennsylvania Superior Court agreed that this evidence was sufficient to support a conviction for luring a child. We find the case distinguishable, because in this instance, the defendant was driving down the street, turned around and pulled over alongside the sidewalk to speak to the child. He did not ask the child to get in the car, and he did not wave for the child to come closer. He was not observed cruising around the area repeatedly, nor was he driving near an elementary school or other area such as a playground which children frequent. He did not specifically motion the child over to him, although he did reach his hand out and ask for a fist bump or high five. In fact, he asked the child how many years the child knew the Defendant, which gives rise to the possibility that the Defendant pulled over to speak to the child because he thought he knew the child, not because the Defendant intended to lure the child into his vehicle. Considering McClintock, we do not find that the evidence of luring in this case rises to that of the conduct in McClintock.

The second issue raised on appeal is whether the evidence introduced by the Commonwealth established a *prima facie* case of interfering with the custody of children. The statute sets forth the following:

> **(a) Offense defined.**—A person commits an offense if he knowingly or recklessly takes or entices any child under the age of 18 years from the custody of its parent, guardian or other lawful custodian, when he has no privilege to do so.

18 Pa. C.S. § 2904(a). The statute does not include the words "or attempts to", which is what the Defendant was charged with. This statute was "enacted with a focus toward parental kidnapping, . . . [but may] extend . . . to protect children from unlawful taking by

11

individuals who are not necessarily their parents, custodians or guardians." McClintock, 433 Pa. Super. at 89, 639 A.2d at 1225 (citation omitted).

There was no evidence that the Defendant actually took the child into his custody. At most, the evidence shows that the Defendant had a conversation with the child and tried to get the child to touch his hand. In McClintock, the defendant was only charged with this offense in connection with the child who entered into the defendant's car, where he remained for one to five minutes, until the defendant released him. Id. In that case, the defendant was not charged in regard to the two other children, who ran away and never got into the defendant's car. We do not believe that this offense applies to situations such as the one at hand where the Defendant never actually took the child into his custody.

Rather, the evidence at most shows that the Defendant stopped his vehicle and conducted a conversation with the child, which scared the child. The child did the right thing which was to end the conversation and walk away from this stranger to him. In today's society, children are being taught from a very early age to beware of strangers. "Stranger Danger" is a program taught in our local elementary schools. However, not all interaction between a child and a stranger, no matter how odd, unusual, upsetting or frightening, rises to the level of criminality. While the Defendant's actions may have scared the child, and may have been unwise and inappropriate actions on the part of the Defendant, we concluded that those actions do not rise to the level of criminal conduct contemplated by the Pennsylvania Legislature in this statute.

12

Finally, the Commonwealth states that we abused our discretion in dismissing the misdemeanor charge of indecent exposure:

> **(a) Offense defined.**--A person commits indecent exposure if that person exposes his or her genitals in any public place or in any place where there are present other persons under circumstances in which he or she knows or should know that this conduct is likely to offend, affront or alarm.

18 Pa. Stat. and Cons. Stat. Ann. § 3127(a).

The evidence demonstrated that the Defendant exposed his genitals to the police officer while stating that he intended to pee on the floor. When the officer told him not to do that, he replaced his clothing over his genitals. At the time, the Defendant was sitting on a bench in the police station, handcuffed, and he had been told by the arresting officer to remain seated on the bench. The mayor testified that the Defendant was seated on a bench yelling at the officers for at least 35 to 40 minutes while the mayor was writing out his statement. There is no evidence that the Defendant exposed his penis for the purpose of sexual gratification, evidence of which has been required by our courts in analyzing the crime of indecent exposure. See Commonwealth v. Rodriguez, 296 Pa. Super. 349, 442 A.2d 803 (1982); Commonwealth v. Sayko, 14 Pa. D. & C.3d 411, 414 (Montgomery Cty. 1978); compare Commonwealth v. Andrulewicz, 911 A.2d 162 (2006); Commonwealth v. Brettman, 7 Pa. D. & C.5th 143, 150-51 (Berks Cty. 2009). There was no evidence that the Defendant exposed himself for the purpose of sexual gratification, or that in addition to opening his underwear, he touched or pleasured himself in front of the officer.

13

Moreover, while the police station is undoubtedly a building open to the public, there was no evidence that the alleged act took place in a public area of the police station, or in an area where the Defendant should have known that his conduct was likely to offend, affront or alarm other persons. There was no evidence regarding whether the particular area where the Defendant was seated was actually open to the public, or, rather, was a secured area inside the police station. See Commonwealth v DeWalt, 752 A.2d 915, 917 (Pa. Super. 2000). The only person who observed the Defendant's genitals was Officer Long, who was seated at a desk across from the Defendant typing up his police report. The Defendant stated that he was going to urinate on the floor as he exposed his genitals; the officer told him not to, and the Defendant complied and replaced his clothing. There was also no evidence that Officer Long was offended, affronted or alarmed by the Defendant's actions; from the testimony we observed, Officer Long appeared to have become annoyed by the Defendant's proposed action as inappropriate and not rational, and a further moment during the continuum of the Defendant's obstreperous conduct that began from the moment he was being taken out of the police car and concluded when Officer Long took him to a different police station which contained a holding cell. The Commonwealth's evidence failed to show that the Defendant knew or should have known that his conduct was likely to offend, affront or alarm another person, or that it was done for the purpose of sexual gratification.

For these reasons, we entered our Order dated January 30, 2018.

14