J-A05033-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| WAYNE C. PECK | : | No. 1128 WDA 2023 |

Appeal from the Order Entered September 6, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0007603-2022

BEFORE: MURRAY, J., KING, J., and FORD ELLIOTT, P.J.E.*

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED: June 23, 2025**

The Commonwealth of Pennsylvania appeals from the order granting a pre-trial petition for writ of *habeas corpus* and dismissing theft by unlawful taking and theft by receiving stolen property charges against Appellee, Wayne C. Peck.[1] This case arises, in part, from an indefinite, but long-term relationship, between a church and an affiliated charity organization. We affirm the *habeas* court because the Commonwealth did not provide *prima facie* evidence that the more than $300,000 taken by Appellee from a joint bank account was exclusively for use by the church, by rule or action of the church, so that the affiliated organization could not use the money in the joint account to operate its charitable functions.

_____

*Retired Senior Judge assigned to Superior Court.

[1] 18 Pa.C.S. §§ 3921(a) and 3925(a), respectively.

The two entities at the heart of this case are: (1) the Community House Church, First Presbyterian Church, Northside (to be referred to as the "Church"); and (2) the Community House, a charitable organization (to be referred to as the "Organization"). The Church is a chartered nonprofit corporation. N.T. Preliminary Hearing, 10/21/22 ("NT-PH"), 70. The "Session" is the group of leaders elected by the membership of the Church to direct the affairs of the Church. *Id.*, 37-38, 78. The Organization is affiliated with, but distinct from, the Church; it has its own board of directors.[2]

On May 2, 2022, Appellee was charged with theft by taking and theft by receiving stolen property in connection with 185 checks drawn on a joint bank account for the Church and the Organization and made payable to Appellee for a total of more than $300,000 from March 2017 through December 2021. *See* Criminal Complaint, 5/2/22 (the "Complaint"); Trial Court Record 15-27. The preliminary hearing was held on October 21, 2022, in the Pittsburgh Municipal Court before a magisterial district judge. The charges were held for trial. NT-PH, 136. On May 1, 2023, Appellee filed a petition for *habeas corpus*

_____

[2] According to the affidavit of probable cause attached to the complaint, a family by the name of Arbuckle built the Community House building in 1916 to provide recreation and fellowship for the Church. It sat next to the church building on property owned by the Church. Over time, the building's use changed; it became a settlement house, as a mission of the Church, to serve residents on the northside of Pittsburgh. Later, it became leasable office space. On May 22, 1988, the original church building was destroyed by fire, and so services were moved to the Community House building. "[T]he Community House" was a nonprofit corporation established in 1919. In 2001, a fictitious name registration was filed for "The Community House of Pittsburgh," listing the Church as the officer. *See* Complaint, Affidavit, 2-4: Trial Court Record, 19-21.

relief seeking dismissal of the charges. Appellee's Petition, 5/1/23; Trial Court Record, 75-108. At the evidentiary hearing on the *habeas* motion, Appellee presented the testimony of a witness without objection by the Commonwealth. N.T. *Habeas Corpus* Hearing, 5/17/23 ("NT-HC"), 4. At the conclusion of the hearing, the *habeas* judge denied Appellee's motion. On August 22, 2023, Appellee filed a "renewed" motion for a writ of *habeas corpus*, which included hundreds of pages of documentation concerning the Organization's reimbursement to Appellee through the more than $300,000 worth of checks drawn on the joint account. *See* Renewed Motion; Trial Court Record, 159-506. On September 5, 2023, the *habeas* court heard argument from the parties on the renewed motion. On September 6, 2023, the court entered an order granting the writ of *habeas corpus* and dismissing the charges against Appellee. Order, 9/6/23; Trial Court Record, 507.

We summarize the evidence introduced at the preliminary hearing in the magisterial district court and at the *habeas corpus* hearing in the Court of Common Pleas of Allegheny County. Appellee was the minister at the Church for approximately 40 years, until his retirement on March 12, 2017, and was on the board of directors of the Organization at all times relevant. NT-PH, 72, 96.

Jonathan Brelsford, Chief Executive Officer of the Pittsburgh Foundation, which holds and administers numerous charitable funds, testified that the Pittsburgh Foundation is the administrator of the Community House Church Funds (the "Funds"), a trust formerly known as the "Arbuckle Trust." He

testified that the "intended beneficiary" or "designee" of the Funds is the Church. The Pittsburgh Foundation relied on an annual reporting requirement from the Church to ensure that money granted by the Funds to the Church was used properly. It did not otherwise review how expenses were approved for either the Church or the Organization. To Mr. Brelsford's knowledge, and the Pittsburgh Foundation's knowledge to the extent Mr. Brelsford could speak to it, the Church and the Organization were one and the same. He was not aware of the alleged use of money from the Funds by the Organization, which had occurred since at least 2009. *See* NT-PH, 6-9, 27-28, 30-32.

During the time Mr. Brelsford was directly involved in administering the Funds, Appellee was the primary contact at the Church. However, Mr. Brelsford was unaware that Appellee retired from the Church in 2017. Four years later, in 2021, Mr. Brelsford was made aware of a communication from an unidentified source to Ashley Hezel, the Director of Operations at the Pittsburgh Foundation, that the money from the Funds was not being used properly. Sometime thereafter, the Pittsburgh Foundation received a communication from the Organization in which the Organization claimed ownership of the money granted from the Funds. *See* NT-PH, 8-14.

As Mr. Brelsford related:

We consulted with our attorney as well as with [an internal committee of the Pittsburgh Foundation], and we ultimately determined that the funds were specifically for the Community House Church.

[The Prosecutor]: And not for this other organization that the funds were being used?

[Mr. Brelsford]: Absolutely.

NT-PH, 10-11.

More specifically, Ms. Hezel conducted the investigation and discovered that there were two similarly named entities. After consulting with an attorney, Mr. Brelsford and Ms. Hezel "made the determination that the church was the appropriate designee of … this fund." No documentation was proffered to support this conclusion by Mr. Brelsford and Ms. Hezel, such as financial audits, interviews, or even records kept by the Foundation. **See** NT-PH, 32-35.

With respect to how the Arbuckle Trust was transferred to the Pittsburgh Foundation, Mr. Brelsford lacked knowledge of the alleged reformation agreement by which the trust was transferred and renamed.[3] Mr. Brelsford did not know the origin of the name "Community House Church." He did not know the Church had allegedly "gone under at least four different names or titles since its inception." Mr. Brelsford did not know the name of the Organization or its relationship with the Church. He did not know the Organization had its own board of directors. **See** NT-PH, 14-17, 23, 27.

Derwin Rushing testified that he was a member of the Church from 1995 to 2012 and a member of the Session for a substantial period. The Session controlled the finances of the Church. In 2005 Mr. Rushing was part of a team

---

[3] The reformation agreement was presented to Mr. Beresford on cross-examination but with the intention of not admitting it into evidence. NT-PH, 15.

that negotiated both the purchase of land by the Church to build a new building and the sale of the land and building in which it had previously operated.[4] Multiple nonprofit organizations used space within the building owned by the Church. Mr. Rushing was not involved with the nonprofits, and did not know whether any of them paid rent to the Church. *See* NT-PH, 37-41, 43.

Though he was a member of the Session, Mr. Rushing did not see any lease agreement between a nonprofit and the Church and could not recall whether any tenant paid rent. Mr. Rushing did not know whether the Church ran the programming initiatives performed by the nonprofits. He was aware of a separate board of directors for the Organization but never understood the relationship between the Church and the Organization. *See* NT-PH, 45-48, 51-52. *See also* Complaint, Affidavit, 3; Trial Court Record, 20.

Carla Campbell, from 2015 was the chief ecclesiastical officer and chief legal officer of the Pittsburgh Presbytery. The Church is a member congregation of the Pittsburgh Presbytery, which exercises supervisory ecclesiastical authority over its members. The property of individual congregations is held in trust for the Presbyterian Church USA, and the Church could not dispose of any real property without authorization from Pittsburgh Presbytery. After Appellee retired from his position as minister of the Church, he "would have absolutely no authority or responsibility for the Church," either

---

[4] Although he did not say so, the Church building to which Mr. Rushing referred was the Community House built by the Arbuckle family and which, after 1988, also housed the Church itself.

financial or religious, per Presbytery rules. Ministers are "typically" not authorized signers for any church-related financial accounts. After Appellee's retirement, however, a bookkeeper at Pittsburgh Presbytery showed Ms. Campbell a check remitted to the Presbytery from the Church. The check contained Appellee's signature, which was contrary to Presbytery rules. Ms. Campbell initiated an inquiry. She empaneled a Special Administrative Review Team ("SART") in accordance with Presbytery rules to investigate the finances of the Church. The SART investigation determined there were sufficient "irregularities and delinquencies" to warrant oversight by the Presbytery of the Church finances. Ms. Campbell did not describe or define the "irregularities and delinquencies" found. In February 2021, an administrative commission of the Presbytery took "original jurisdiction" of the Church, that is, acted as the Session for the Church. *See* NT-PH, 70-76, 81-83.

Detective Jackleyn Weibel, assigned to the Allegheny County District Attorney's Office conducted the criminal investigation and was the affiant of the affidavit of probable cause attached to the complaint. She was a forensic accountant and a certified fraud examiner. She executed search warrants on the Church and for an account at First National Bank that had originally been in the name of the Church. On March 11, 2017, the day before Appellee retired as minister of the Church, the name on the account was changed from the Church to the Organization. The signatories on the account also were changed to be Appellee, who had previously been a signatory, Appellee's wife, and Jeff

Berkowitz, a member of the Church and board member of the Organization. *See* NT-PH, 81, 93-96.

Detective Weibel created a summary of thousands of pages of records for the account. Money deposited into the account came from the Funds, two other trusts, rent from the new Church building and donations. Money drawn from the account covered various expenses, including to Independent Controllers and for the Church's utility bills, cleaning services, and payments to pastors. From March 2017 through March 2021, there were also 182 checks drawn on the same account, all made payable to Appellee for a total of $357, 478.63. Those checks were stamped with Appellee's signature and deposited into one of two accounts owned by Appellee and his wife at Dollar Bank. Each of the checks were created by Independent Controllers, either by Jennifer Nagy or Mr. Sinicrope. In an interview with Ms. Nagy and Mr. Sinicrope, the detective was informed that the checks were created upon notification by Appellee and that there was no documentation to support the requests.[5] However, the detective did not speak with any member of the Board of Directors of the Organization. The detective explained, in her view, the theft occurred once the money was deposited in Appellee's bank account; how that

_____

[5] Mr. Sinicrope also told the detective that his client was Appellee and that he would only release information to persons whom Appellee directed, including information about the Church as well as the Organization. NT-PH, 126. Independent Controllers created budgets and financial reports for the Church. *See id.*, 129-130, 133.

money was spent thereafter did not matter. *See* NT-PH, 97-104, 107, 109-111, 113, 119-120.

Detective Weibel wrote the criminal complaint charging Appellee with theft based on the checks written from March 2017 through 2021. She included the history of the Church and the Organization in the complaint to explain some of the grant language from the Arbuckle Trust. She explained that they were separate organizations, per her interview with Appellee. A forensic audit confirmed that the finances of the Church and Organization were commingled. Based on her interviews, some members of the Church were aware that funds in the First National Bank account were being used by the Organization. According to Appellee, the funding of the Organization's activities through a joint bank account also happened prior to 2017, but, other than James Bucynski, the detective did not interview any member of the Church who knew of such arrangement. She confirmed that there were payments to Appellee for expenses drawn on the First National Bank account prior to 2017, which could have been for the benefit of the Organization rather than the Church. There also were payments to the Church from the First National Bank account after 2017 totaling approximately $200,000 made payable to the clerk of the Session in payment of her salary as the building manager for the Organization. *See* NT-PH, 114-115, 121, 123-125, 135. *See also* Complaint, Affidavit, 4; Trial Court Record, 21.

Appellee presented the testimony of James Bucynski at the *habeas corpus* hearing. He testified to being a member of the board of directors and

finance chair for the Organization and a former member of the Church and of Session from April 2004 through Appellee's retirement. He explained that the Church and Organization were long-affiliated organizations, and that the Organization provides programs for the community. The Organization had been in existence since about 1970. It was a rule of the Pittsburgh Presbytery that Appellee could have no role in the operation of the Church after his retirement, but there was no similar rule for affiliated organizations. Appellee continued as a board member for the Organization after his retirement from the Church, as he had been before retiring from the Church. Mr. Bucynski testified that the Organization had strict protocols for processing reimbursements, which were reviewed at a weekly meeting between the witness and Appellee, and the process the Organization followed provided a paper trail of the distribution of money. He testified that Appellee could not spend money on behalf of the Organization without prior approval of the board. *See* NT-HC, 4-11, 20, 32.

Included in the weekly meetings was an active Church member with expertise in the processing of reimbursement receipts. He was included because of Mr. Bucynski's concerns over the "legacy" reimbursement and finance system that included the "joint or shared bank account" at First National Bank. The process Appellee developed for reimbursements was meant to comply both with this legacy reimbursement system and the limits placed on the Organization by a "mission statement" from the Funds. Mr. Bucynski affirmed that the money in the joint bank account was primarily from

the Funds, deposited in the account yearly, for the Organization. The Organization was funded in this manner for the entire thirteen years Mr. Bucynski was with the Organization, and, to his knowledge, since the beginning of the Arbuckle Trust. According to Mr. Bucynski, Appellee only accessed the Organization's funds in the shared bank account. However, he also admitted that Appellee had access to all of the funds and that the other signators on the account after March 2017 were affiliated with the Organization and not the Church. He affirmed that each of the 185 checks made payable to Appellee for over $375,000 were authorized by the Organization. *See* NT-HC, 11-16, 22-26, 30-31.

Mark Sinicrope and Independent Controllers, according to Mr. Bucynski, were an additional level of review of expenses and payments beyond himself and Appellee. They provided both auditing and accounting services to the Organization and sent a financial report to the Session on a quarterly and yearly basis. It was the obligation of the Session member who received the report to circulate it to the entire Session. *See* NT-HC, 16-21.

Mr. Bucynski also testified, contrary to Mr. Brelsford, that the money from the Funds was intended to be for the Organization and the Church. He contended that Mr. Brelsford was mistaken that the money from the Funds was for the Church alone, as it was inconsistent with "the history of these two organizations. That has always been in question, and the legal remedy had been forbearance to be able to work together." The Organization had been

given legal advice, prior to the move of the Arbuckle Trust to the Pittsburgh Foundation, to avoid a trial on the issue.[6] *See* NT-HC, 14-15, 26-27.

At the end of the *habeas corpus* proceeding, the court focused on the reimbursement payments and whether they were legitimate. Believing the question to be of credibility, it denied Appellee's motion. *See* NT-HC, 32-36. Appellee then filed a renewed petition on August 22, 2023, which included, *inter alia*, hundreds of pages of reimbursement reports submitted by Appellee to Independent Controllers. *See* Renewed Motion, ¶18 & Exhibit A; Trial Court Record, 164 & 182-451. On September 5, 2023, the court heard argument on

---

[6] Neither the Arbuckle Trust agreement nor similar documentation for the Funds was submitted as evidence. From a discussion between counsel and the *habeas* court, it could be inferred that the Arbuckle Trust agreement named the "Community House Church" as the beneficiary, but there was a dispute as to whether that encompassed just the Church, which may not have had that precise name at the time, or the Church and the Community House building as predecessor of the Organization, which would have been consistent with the intent of the Arbuckle family as testified to by Mr. Bucynski. *See* NT-HC, 8, 26, 28-30.

According to the affidavit, the original Arbuckle Trust document bequeathed the Community House building erected by the Arbuckle family to the Church and the income "should be applied in perpetuity to the support and maintenance of the Community House." Complaint, Affidavit, 6; Trial Court Record, 23. The court order transferring the trust to the Pittsburgh Foundation stated that it had been "created [as] a charitable trust for the benefit of the First Presbyterian Community House of the North Side of Pittsburgh" the net income of which was to go the directors of the Community House to be used to pay for "taxes, insurance, repairs, renewals and replacements of the building(s), compensation, maintenance and/or support of workers, teachers and employees therein; materials and supplies, generally to pay all prior charges incurred in the accomplishment of the work of the Community House," as governed by the directors. *Id*.

the Renewed Motion. On September 6, 2023, it granted the Renewed Motion and dismissed the case. Order, 9/6/23; Trial Court Record, 507.

The Commonwealth filed a timely notice of appeal on September 21, 2023. It also filed on September 28, 2023, a statement pursuant to Pennsylvania Rule of Appellate Procedure 1925. The trial court filed an opinion on May 7, 2024 (the "Trial Court Opinion").

The questions presented in this appeal are:

I.     Whether the trial court erred in granting the petition for writ of *habeas corpus* where the Commonwealth presented sufficient evidence that [Appellee] took money out of the [C]hurch's accounts for his own purposes without authorization and at a time when he no longer had any fiduciary control over such funds?

II.    Whether the trial court erred in finding that [Appellee's] use of the funds taken from the church accounts for the benefit of a charity negated his criminal culpability?

Appellant's Brief, 4.

A petition for writ of *habeas corpus* is the correct method for testing whether the Commonwealth has, prior to trial, established a *prima facie* case. **Commonwealth v. Dantzler**, 135 A.3d 1109, 1111 (Pa. Super. 2016) (*en banc*). The grant of a writ of *habeas corpus* dismissing all pending charges against Appellee is "a proper subject for appellate review." **Commonwealth v. Heatherington**, 331 A.2d 205, 209 (Pa. 1975); **see also Commonwealth v. Merced**, 265 A.3d 786, 790-791 (Pa. Super. 2021) (discussing appealability of judicial decisions finding insufficient evidence of a *prima facie* case).

- 13 -

"At the pre-trial stage of a criminal prosecution, it is not necessary for the Commonwealth to prove the defendant's guilt beyond a reasonable doubt, but rather, its burden is merely to put forth a *prima facie* case of the defendant's guilt." ***Commonwealth v. Huggins***, 836 A.2d 862, 866 (Pa. 2003). "The evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to go to the jury." ***Id.***

"The evidentiary sufficiency of the Commonwealth's *prima facie* case is a question of law over which our standard of review is *de novo* and the scope of review is plenary." ***Commonwealth v. Newton***, 318 A.3d 133, 139 (Pa. Super. 2024) (citation omitted). As such, "the trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its pre-trial, *prima facie* burden to make out the elements of a charged crime." ***Commonwealth v. Karetny***, 880 A.2d 505, 513 (Pa. 2005). "[A] *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes probable cause to warrant the belief that the accused committed the offense." ***Commonwealth v. Perez***, 249 A.3d 1092, 1102 (Pa. 2021). "Moreover, inferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case." ***Huggins***, 836 A.2d at 866 (internal citations, quotation marks and brackets omitted).

The Pennsylvania Rules of Criminal Procedure provide that hearsay "shall be considered by the issuing authority in determining whether a *prima facie* case had been established," and "shall be sufficient to establish any element of an offense, including, but not limited to, those requiring proof of the ownership of, non-permitted use of, damage to, or value of property." Pa.R.Crim.P. 542(E). ***See Commonwealth v. McClelland***, 233 A.3d 717, 735 (Pa. 2020). However, consistent with precedent and due process, the finding of a *prima facie* case may not rest on hearsay alone. ***Id.*** at 736. Rather, hearsay may be solely relied upon to establish an element of a charged offense, but not that the accused committed the offense. ***See Commonwealth v. Harris***, 315 A.3d 26, 35–36 (Pa. 2024).

> The statutory definitions of the charged theft crimes are:
>
> A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof.

18 Pa.C.S. § 3921(a) (defining theft by unlawful taking or disposition); and

> A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner.

***Id.*** at § 3925(a) (defining theft by receiving stolen property). For purposes of Section 3925, "'receiving' means acquiring possession, control or title[.]" ***Id.*** at § 3925(b).

- 15 -

"Property" is defined for theft crimes as, *inter alia*, "anything of value."

*Id.* at § 3901. "Property of another" includes:

> property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property and regardless of the fact that the other person might be precluded from civil recovery because the property was used in an unlawful transaction or was subject to forfeiture as contraband. Property in possession of the actor shall not be deemed property of another who has only a security interest therein, even if legal title is in the creditor pursuant to a conditional sales contract or other security agreement.

*Id.* "The statutory language is clear that the issue of whether [the accused] may have an interest in this property is irrelevant." *Commonwealth v. Mescall*, 592 A.2d 687, 691 (Pa. Super. 1991).

Accordingly, the elements of theft by unlawful taking in this case are that Appellee: (1) unlawfully took, or exercised control over $357,478.63; (2) which was the property of another in that the Church had "an interest in the money which [Appellee was] not privileged to infringe;" and (3) with the intent to deprive the Church thereof. *See Com. ex rel. Lagana v. Com. Off. of Atty. Gen.*, 662 A.2d 1127, 1129 (Pa. Super. 1995) (reciting elements of theft by unlawful taking). The *mens rea* required for theft by taking is the "intention or conscious object … to take unlawfully the property of another for the purpose of depriving the other of [the] property." *Commonwealth v. Dombrauskas*, 418 A.2d 493, 496 (Pa. Super. 1980). With respect to theft by receiving stolen property, the elements in this case are that Appellee: (1) received, retained, or disposed of $357,478.63; (2) which was the property

- 16 -

of another in that the Church had "an interest which [Appellee was] not privileged to infringe;" (3) and knew or had reason to know that the money had been stolen, unless the money was received, retained, or disposed with the intent to restore it to the Church. *See Lagana*, 662 A.2d at 1130 (reciting elements of theft by receiving stolen property). Furthermore, when "evaluating whether the Commonwealth has made out its *prima facie* case, criminal intent may be inferred from circumstantial evidence." *Id.* at 1129-30.

The *habeas* court explained in its written opinion that the "problem with this case … is that the funding for both [the Church and the Organization] came from a shared bank account through a shared funding source," namely the Funds administered by the Pittsburgh Foundation. Trial Court Opinion, 5. The court accurately noted that "[n]o witness for the Commonwealth established unequivocally that funds [in the joint bank account] were to be used solely for the Church, and not the [Organization]." *Id.*, 6. The court stated, the "matter appears to be … a civil matter that would clarify the relationship between the [Church and Organization]." *Id.*, 7.

In addition, the court noted that:

[a]ll of [Appellee's] expenditures appeared to be reimbursements approved by the [Organization's] accountants, Independent Controllers. The funds came from a single bank account which was shared by [the Organization and Church. The Organization] appears to be the entity which provides social and charitable services, including, but not limited to providing food, clothing and shelter to the marginalized members of the local community.

*Id.*, 7.

The Commonwealth argues that the *habeas* court erred in concluding "that the loss of funds was a civil matter." Appellant's Brief, 11. After reciting the standards of review and summarizing the evidence, it argues that "it is irrelevant that [Appellee] took the money to use for charitable purposes" because "the money was not his to spend or direct." *Id.*, 17. Specifically, "Appellee took funds totaling $357,478.63 from a Church account that he had no authorization to direct or control after he retired as pastor and had no permission to take or direct funds" belonging to the Church. *Id.* "To the extent that appellee has interjected the idea that the source of the funds and who it was intended for is at issue, and that he did have the authority from the Organization to take those funds, these are questions of weight and credibility which is not appropriate when reviewing a petition for a writ of *habeas corpus*." *Id.*

The Commonwealth's argument is based on a determination that the money was either taken from a Church account or was from funds belonging to the Church. There is some evidence for this contention in the form of Mr. Brelsford's testimony that the intended beneficiary of the Funds was the Church. NT-PH, 7. That Appellee, through the Organization, may also have had an interest in the money is irrelevant for proving whether a theft crime may have been committed. *Mescall*, 592 A.2d at 691. We therefore agree with the Commonwealth that there was *prima facie* evidence that the Church

possessed an interest in the money derived from the Funds deposited into the joint bank account.[7]

Alone, however, that determination is not sufficient to establish that the money withdrawn from the bank account was the "property of another," because the full definition is "property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property[.]" 18 Pa.C.S. § 3901. The question here is whether the evidence showed that Appellee did not have a privilege to infringe on the Church's interest with respect to the money withdrawn from the joint account between March 14, 2017, and December 31, 2021. **See** Criminal Information, 5/2/22; Trial Court Record, 63. After close review of the testimony, we find that the Commonwealth did not present *prima facie* evidence that Appellee was not privileged to access the money in the joint account.

At all times relevant, Appellee did have authority, at least vis-à-vis First National Bank, to access the funds in the joint account as he was a signator

_____

[7] By finding *prima facie* evidence on this point, we do not intend to preclude the possibility that the Organization may have also been a beneficiary of the Funds. Mr. Bucynski testified that the Funds were intended for the Organization, or at the very least for the construction of a "Community House" for the Church and not for the sole use of the Church. **See** NT-HC, 8, 27. Since we affirm the dismissal of charges, the issue of the intended beneficiary or beneficiaries of the Funds and the proper uses for the money granted, as well as control and division of all the funds in the joint bank account, would be a proper subject for a civil trial.

on the account. Thus, the Commonwealth, at the very least, had to present *prima facie* evidence that some action or policy limited his access.

The Commonwealth did not present direct evidence from the Church, the party with the other interest in the funds in the joint account, that Appellee did not have a privilege to use those funds. Direct evidence could have come in the form of a statement or action by the Session, which had financial oversight for the Church. The record is silent with respect to whether the Session ever exercised its authority over Church funds in the joint account to distinguish the funds that Appellee could use on behalf of the Organization from that which he could not use. The Session also was silent on whether Appellee continued to have authorization to use the money for the Organization.

In light of this lack of direct evidence, the Commonwealth's contention that Appellee "had no authorization to direct or control [the money in the joint account] after he retired as pastor and had no permission to take or direct funds" belonging to the Church must rest on indirect evidence. **See** Appellant's Brief, 17. First, the Commonwealth asserts that the "Church had three streams of income, the Arbuckle Trust, rents from its former building, and weekly parishioner contributions." Appellant's Brief, 14. A more accurate summary of the evidence is that the joint bank account had these three income streams, but there was no evidence that the Church controlled the use of the funds

once in the joint account, much less prohibited Appellee's use of the money in the account.[8]

Second, the Commonwealth asserts that the "funds were deposited into a First National Bank account which was administered by an outside accounting firm, Independent Controllers, on behalf of the Church." Appellant's Brief, 14-15. There was no direct evidence that Independent Controllers was employed by the Church at the relevant time, only that it provided quarterly financial reports to the Session. NT-PH, 52. The detective interviewed the two principals at Independent Controllers and confirmed that they considered Appellee to be their client and would not provide information without his permission. **See** NT-HC, 122-123, 129. Mr. Bucynski explained that Independent Controllers had been hired by the Organization as part of the Organization's efforts to comply with the mission statement provided by the Arbuckle Trust. **See** NT-HC, 15-17. To the extent that Independent Controllers administered the First National Bank account, it did so for the Organization, as much, if not more than, for the Church.

---

[8] Although there was *prima facie* evidence that the intended beneficiary of the Funds was the Church, it was not a reasonable inference from that testimony that the rest of the money in the account also was intended for the Church. The "rents from the former Church building" may well have been intended for the Organization. The former Church building was the original Community House building, and the manager of the current Church building was paid a salary by the Organization from the joint account. NT-PH, 135. The Commonwealth did not exclude the possibility that the rents paid were to the Organization rather than the Church. Moreover, there were community donations, with no evidence of limitations on that money, deposited into the bank account as well. *Id.*, 99-100.

Third, the Commonwealth recites evidence that, after Appellee retired, "the rules and regulations of the [Pittsburgh] Presbytery," prohibited him from "responsibility or authorization to access or direct church funds." Appellant's Brief, 15. Insofar as Ms. Campbell testified only to the rules of her religious organization, this summary is correct. *See* NT-PH, 71-73. However, there was no testimony that the rules were applied to Appellee in a binding manner or how the rules might by legally binding on him or First National Bank. The Pittsburgh Presbytery did not have a direct interest to enforce in the joint bank account. *Id.*, 73. Its interest in the Funds could only have been derived from the national denomination's interest as the beneficiary of property held in trust by the Church. *Id.* Certainly, no evidence was proffered to establish that the Presbytery could dictate the appropriate division of the money in the First National Bank account.[9]

Ms. Campbell's testimony even failed to demonstrate that Appellee was bound by the Pittsburgh Presbytery's regulation that he have no role in Church finances upon his retirement. In explaining the "former pastor policy form," Ms. Campbell could only state that "pastors are often asked to sign an acknowledgment" and that she was "not aware of whether [Appellee] signed it or not." *Id.*, 72. She could only state, vaguely, that it was "posted on our

_____

[9] We note that a commission of the Presbytery assumed original jurisdiction from the Session in February 2021. Even if we infer that this commission could have then dictated an appropriate division of the commingled funds, no evidence that it did so was introduced. Thus, like the Session from March 2017 until February 2021, the Presbytery's commission was silent as to the proper division of funds in the First National Bank account.

website," without any additional explanation of how the posting of a policy would thereby make it binding, even if "[e]veryone can find it there." *Id.* Ms. Campbell also claimed that "ministers of churches typically are not authorized signers for any financial accounts or instruments." *Id.*, 74. Yet, the Commonwealth's evidence was clear that Appellee was a signator on the First National Bank account prior to his retirement. *Id.*, 95-96. The evidence in the record does not support The Commonwealth's contention that that the Presbytery's policies were enforced on Appellee.

More importantly, even if the Pittsburgh Presbytery had enforced its rule that retired ministers could not access Church funds, there was no such rule prohibiting Appellee from accessing money meant for the benefit of the Organization as an affiliated organization of the Church. NT-HC, 19. This brings us back to the lack of evidence that Appellee was not privileged to access the funds in the First National Bank account. The evidence presented by the Commonwealth only suggested that Appellee should not have had access to Church funds under Presbytery policies, but there was no evidence that such policies were enforced against him, much less that there was any other prohibition on his access to the money deposited into the joint account. Even more damaging to the Commonwealth's case against Appellee is that the evidence emphasized that Appellee did, in fact, have access to the Church funds as a signator on the joint bank account and had that access for years prior to his retirement.

That there was *prima facie* evidence the Church was the intended beneficiary of the Funds does not inferentially support an assumption that the money deposited in the joint bank account was thereby limited in its use only to the Church itself. Although the Pittsburgh Foundation administered the Funds, it did so only under the terms of the Arbuckle Trust and subsequent reformation agreement. Except for the portions of the Arbuckle Trust and reformation agreement included in the affidavit of probable cause, these essential documents to the intended use and purpose of the Funds were not introduced into the record. Instead of the documents, the Commonwealth relied on the vague recollection of Mr. Brelsford to establish the intended beneficiary; however, even he did not testify to any specific limitation on the use of the Funds by the Church other than the Funds be used for the Church generally.

In response to the prosecutor's question to whether the Organization was excluded as a beneficiary of the Funds, however, he answered "absolutely," but admitted he had been unaware that the Organization and Church were distinct entities. **See** NT-PH, 11, 17-18. In addition, he testified that the Church had certified the grant money was used properly every year since 2009, even though the Organization had used money from the annual grant. **Id.**, 31-32. Since Mr. Brelsford understood the Organization and the Church were not distinct entities, then his assertion that the Funds were not for the Organization, but only for the Church, provides little to no clarity on the key issue. It does not preclude the Church from permitting the

Organization to use the Funds in a manner consistent with Church purposes. This is precisely what the evidence shows occurred in the years before Appellee retired. The Organization used money from the joint account to support its charitable undertakings and the Church approved that use by its certification to the Pittsburgh Foundation that the annual grant funds had been properly used. In other words, the pattern and practice for several years prior to Appellee's retirement among the Foundation, the Church and the Organization, permitted the use of the money in the joint bank account to fund the programs operated and supported by the Organization. We cannot infer a prohibition on the use of the money in the joint account to fund Organization programs from this evidence.

Because of the absence of any direct evidence that the Session prohibited Appellee's use of the joint account in the manner that Appellee used it from 2017 through the end of 2021, or any indirect evidence from which we could reasonably infer such prohibition, the Commonwealth failed to demonstrate a *prima facie* case supporting theft charges against Appellee. There was no evidence of limitation on the money from the Funds once placed in the joint account. There also was no evidence to show that Appellee accessed Church funds that he was not privileged to access. It was the position of both the Commonwealth and Appellee that the First National Bank account contained commingled funds for the two affiliated entities. Plainly, Appellee was privileged to access the Organization's funds, where the expenditure had been approved by the board. He had been privileged to use the money in the

account to support the Organization's programs before his retirement. There was no evidence demonstrating that he was no longer permitted to do so.

Furthermore, the Organization acted in a manner wholly consistent with it properly using the money. Mr. Bucynski testified that the Organization had in place protocols to ensure that money drawn from the joint account was properly used on behalf of the Organization and each expenditure was documented. *See* NT-HC, 8-14, 16-17, 31-32. The main protocols were in place prior to 2010 and were refined during Mr. Bucynski's tenure on the Organization's board. *See id.*, 9-11. The Organization had a "mission statement" from the Arbuckle Trust as to how it could spend the money it received from the Funds. *Id.*, 14. The Organization's board had to approve each expenditure before it was made, and a subset of persons from the board, usually Mr. Bucynski, met weekly with Appellee to go over each of the receipts for money spent. *Id.*, 8, 10. Each expenditure had to be documented and identified for a specific program sponsored by the Organization. *Id.*, 8-9. The receipts and documentation for the expenditures were forwarded to Independent Controllers, which provided both auditing and accounting services to the Organization and which reviewed the documentation before issuing a check drawn on the First National Bank account. *Id.*, 16-17. All of the checks on which the theft charges are based were prepared by Independent Controllers pursuant to the Organization protocols. *Id.*, 16-17, 22; *see* NT-PH, 101, 108. Independent Controllers provided quarterly and yearly reports to the Session to provide a complete accounting of how the

Organization spent its funding. NT-HC, 17. There is no record evidence to support an inference that the Session, or the Presbytery's commission after it assumed original jurisdiction in February 2021, objected to the Organization's activities.

The record demonstrates that the Organization had been operating in the same way, drawing money from the joint bank account, for years before Appellee's retirement. NT-HC, 10; *see* NT-PH, 124. According to Mr. Bucynski, the shared account was how the Church and Organization had determined, sometime in the past, to provide money for the Organization's operations. NT-HC, 15. The Organization drew money from the joint account to fund its operations both prior to Appellee's retirement and after it. Appellee's retirement from the Church only changed his relationship with the Church, not the Organization. More importantly, it did not criminalize the operations of the Organization, at least not on the record before us, because there was no evidence that money in the joint account could not be used in the manner the Organization directed. The Commonwealth's failure to delineate any applicable limitations on the use of the money withdrawn by Appellee from the joint account that would prohibit the way Appellee used it, was fatal to its *prima facie* case for two counts of theft.

We hold that the Commonwealth did not present *prima facie* evidence that Appellee was not privileged to withdraw money from the joint bank account to fund the operations of the Organization. Therefore, the evidence was insufficient to prove the element that the money withdrawn from the

account was the "property of another" as defined by the statute. Accordingly, we affirm the *habeas* court.[10]

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 6/23/2025

_____

[10] Given our determination that the Commonwealth did not present a *prima facie* case for either theft charge, we need not address its second question asking whether Appellee's use of the funds for the benefit of a charity negated his criminal culpability. We specifically note that, on this record, Appellee's use of the funds for the benefit of the Organization was relevant to whether he had a privilege to access the money in the joint bank account.